**ROLLS–ROYCE PLC, Plaintiff,**

v.

**UNITED TECHNOLOGIES CORP., Defendant.**

**No. 1:05cv362 (LMB/TCB).**

United States District Court, E.D. Virginia, Alexandria Division.

March 31, 2009.

James Albert Oliff, John Walter O'Meara, William Jerome Utermohlen, Oliff & Berridge PLC, Alexandria, VA, for Plaintiff.

John A.C. Keith, Blankingship & Keith PC, Fairfax, VA, for Defendant.

## MEMORANDUM OPINION

LEONIE M. BRINKEMA, District Judge.

This civil action arises from an interference proceeding between Rolls–Royce plc

("Rolls–Royce") and United Technologies Corporation ("UTC") involving their patents covering the designs of jet engine fan blades. On December 31, 2003, the Board of Patent Appeals and Interferences ("the Board") of the United States Patent and Trademark Office (PTO) declared Patent Interference No. 105,195 between Rolls–Royce's U.S. Patent No. 6,071,077 and UTC's Reissue Application No. 09/874,931. After the. interference was declared, Rolls–Royce filed a preliminary motion for judgment based on no interference-in-fact under 37 C.F.R. § 1.633(b). The Board denied this motion on February 2, 2005, effectively deciding the interference in favor of UTC. Rolls–Royce has appealed that decision to this Court under 35 U.S.C. § 146. After a three-day bench trial during which testimonial and documentary evidence was received, the matter was taken under advisement. For the reasons discussed in detail below, the Board's Decision on Preliminary Motions ("the Decision") (Docket # 81, Ex. 142) will be reversed and judgment in the '195 interference will be entered in favor of Rolls–Royce.

## I. *Procedural Background*

### A. *Filing History of the Patents*

The relevant filing history of UTC's patent application began on November 17, 1995,[1] with the filing of U.S. patent application no. 08/559,965 ("'365 application"). The '965 application, directed towards a "Swept Turbomachinery Blade" invented by David A. Spear, Dennis N. Kantor, Bruce P, Biederman, and John A. Orosa, issued as patent no. 5,642,985 ("'985 patent") on July 1, 1997. After the patent issued, UTC filed two successive reissue applications[2] based on the '985 patent. The first of these, reissue application no. 09/343,736 ("'736 application"), was filed on June 30, 1999, and issued on March 18, 2003, as patent no. RE38,040 ("'040 patent"). The second of these applications, reissue application no. 09/874,931 ("'931 application"), was filed on June 5, 2001, as a continuation of the '965 application. The '931 reissue application represents UTC's invention (and the counterpart to Rolls–Royce's '077 patent) in the interference between the parties.

The relevant filing history of Rolls–Royce's patent began in Great Britain, with the filing of British patent application no. 9607316.8 on April 9, 1996.[3] On March 18, 1997, Rolls–Royce filed a parallel U.S. patent application, no. 08/819,269 ("'269 application"),[4] directed towards a "Swept Fan Blade" invented by' Paul A. Rowlands ("Rowlands"). During the pendency of the '269 application (which was later abandoned), Rolls–Royce filed continuation-in-part application no. 09/168,968 ("'968 appli-

---

1. November 17, 1995, is also UTC's "effective filing date" in the interference, the significance of which is discussed in more detail below.

2. Under 35 U.S.C. § 251, a reissue application must be filed within two years of the issuance of the original patent, and may include new claims that broaden, narrow, or otherwise alter the scope of the original patent.

3. April 9, 1996, is Rolls–Royce's effective filing date in the interference.

4. Under 35 U.S.C. § 119(a), a United States patent application may claim the priority of a foreign filing date if the United States filing, is made within one year of the foreign application, and the foreign country is a signatory to the Paris Convention. Rolls–Royce's '269 application met these conditions, and properly received the benefit of April 9, 1996, as the filing date.

cation") on October 9, 1998. The '968 application issued on June 6, 2000, as patent no. 6,071,077 ("'077 patent"). The '077 patent represents Rolls–Royce's claimed invention in the interference with UTC.

### B. Background of the PTO Interference Proceedings

#### 1. Purpose of An Interference

The purpose of an interference is to determine which of. multiple parties, each asserting patent rights to the same claimed invention, was the first to actually invent it. The invention at issue is defined by what is known as a "count," which consists of one or more claims from the parties' respective patents or applications. At the outset of the proceeding, one of the parties is declared the "senior party" based on the earlier effective filing date of its patent. The senior party is *prima facie* presumed to have invented first, and the burden remains on the "junior party" to prove otherwise, by a preponderance of the evidence.

The interference proceeding is conducted by one or more administrative law judges of the Board. The Board neither conducts a trial nor receives live testimonial evidence. Instead, after conducting lim-

ited discovery governed by the PTO's.rules of procedure, the parties argue their positions to the Board, which issues a written decision.

#### 2. Declaration of the '195 Interference

The interference at issue was provoked by UTC during the examination of its '931 reissue application, when UTC persuaded the examiner to recommend to the Board that it declare an interference between UTC's '931 application and Rolls–Royce's issued '077 patent. The Board agreed with the examiner and declared patent interference no. 105,195 ("'195 interference") on. December 31, 2003. Notice of Interference (Docket # 142, Ex. 1). With an effective filing date of November 17, 1995, (compared to Rolls–Royce's April 9, 1996), UTC was named the senior party and Rolls–Royce the junior party to the interference.[5] A single count was defined, the substance of which the parties have stipulated[6] is represented by Rolls–Royce's '077 patent claim 8 and UTC's '931 reissue application claim 23.[7]

#### 3. The Parties' Preliminary Motions

Before the Board reaches the merits of who was first to invent, the parties may file "preliminary motions" to address various issues.[8] Often, the substance of these

5. By convention, the parties to an interference, or "interferents," are defined by the names of the inventors of the respective applications or patents at issue. Here, the senior party was declared as David A. Spear, Dennis N. Kantor, Bruce P. Biederman, and John A. Orosa, the inventors of the '931 reissue application. Similarly, the junior party was declared as Paul A. Rowlands, inventor of the '077 patent. However, the Board also recognizes the "real parties in interest" to the interference, Typically, these are the companies which employ the inventors, and which actually own, by assignment, the patents or applications at issue. For simplicity, the Court will refer to the senior and junior parties by the real parties in interest, UTC and Rolls–Royce, respectively.

6. Stipulation of Uncontested Facts at 3. (Docket # 140)

7. The actual Count 1 declared by the Board was defined as: claim 18 of the '931 application or claim 23 of the '931 application or claim 1 of the '077 patent or claim 8 of the '077 patent.

8. The types of preliminary motions available to interferents include, by way of example: 1) a motion for judgment on the ground that an opponent's claim corresponding to a count is not patentable to the opponent, 37 C.F.R. § 1.633(a); 2) a motion to declare an additional interference, 37 C.F.R. § 1.533(e); and 3) a motion to be accorded the benefit of the filing date of an earlier application filed in the United States or abroad, 37 C.F.R. § 1.633(f).

motions is entirely peripheral to the issue of priority of invention.

However, on April 8, 2004, Rolls–Royce filed a dispositive motion entitled "Rowlands Preliminary Motion 1 (for judgment based on no interference-in-fact pursuant to 37 C.F.R. § 1.633(b))," in which Rolls–Royce argued for a dismissal of the interference altogether on the ground that the parties had actually invented and claimed patentably distinct[9] inventions. In support, Rolls–Royce pointed to two elements of its claim 8 fan blade that it alleged did not exist in,[10] and were not obvious to,[11] UTC's claim 23 fan blade. These elements, discussed in more detail below, are generally described as 1) an "outer region [of the blade] defining a forward sweep angle" and 2) a "convergent casing" at the inner duct wall of the fan rotor region,

On April 29, 2004, UTC filed a preliminary motion, entitled "Spear Preliminary Motion 1 (adding a claim to Spear's application)," in which it sought to redefine the interfering subject matter allowed under 37 C.F.R. § 1.533(c), by adding a new claim 24 to its '931 application, which would then be incorporated into the interference count. The new claim 24, if allowed, would be dependent upon claim 23, and would incorporate into UTC's claimed invention the "convergent casing" element which Rolls–Royce claims, in part, makes its invention patentably distinct.

### 4. *The Board's Decision on Preliminary Motions*

On February 2, 2005, the Board issued its Decision on Preliminary Motions ("Decision") and entered a final judgment for UTC in the '195 interference. In its Decision the Board denied Rolls–Royce's preliminary motion for judgment based on no interference-in-fact and denied as moot UTC's preliminary motion to add a new claim 24.[12]

In its Decision, the Board discussed the two elements that Rolls–Royce asserted made its claimed invention patentably distinct from UTC's; i.e., (1) forward sweep in the outer region of the blade and (2) a convergent inner duct wall in the rotor region, The Board found that the first element was actually covered by the broad claim language in UTC's '931 application, and was therefore anticipated under § 102, and also found that the element was well known in the industry at the time of the invention, and therefore obvious under § 103. As a result of these findings, the Board ruled that the interference was in fact properly declared. In denying Rolls–Royce's preliminary motion, the Board essentially found interfering subject matter between the parties based on the claims already included in the count. Therefore, allowing UTC to add a new claim 24 to its '931 application, and incorporating that claim into the count, would add nothing new to the interference analysis. For that reason, the Board denied UTC's motion as moot.

Having found the existence of an interference-in-fact, the Board essentially decided that the parties had indeed invented and claimed the same device.[13] Therefore,

---

9. "Patentably distinct" means novel (35 U.S.C. § 102) and nonobvious (35 U.S.C. § 103).

10. I.e., novel under 35 U.S.C. § 102.

11. I.e., nonobvious under 35 U.S.C. § 103.

12. The Decision also addressed the parties' "Motions to Suppress," a procedural vehicle by which one party to an interference objects to the exhibits offered by an opposing party. The Board dismissed both parties' Motions to Suppress as moot, because the exhibits at issue did not affect the Board's analysis of the preliminary motions. Decision at 20–21.

13. Technically, the claimed inventions were not found to be identical but rather patentably

barring any further preliminary motions, the only issue remaining for the Board in the interference was the ultimate issue of which party actually invented first. However, this issue was conceded by Rolls–Royce, which could not establish a date of invention before UTC's effective filing date of November 17, 1995. Given that concession, the Board's Decision was dispositive of the entire interference, and judgment was entered in UTC's favor.

### 5. Procedural History of the § 146 Civil Action in this Court

A party which is dissatisfied with the Board's decision in an interference may seek review in a federal court under 35 U.S.C. § 146.[14] Rolls–Royce exercised its rights under § 146 and filed this civil action against UTC, seeking (1) reversal of the Board's Decision to the extent it denied Rolls–Royce's Preliminary Motion No. 1 for no interference-in-fact; (2) entry of judgment for Rolls–Royce in the '195 interference; and (3) an award of costs and attorneys' fees pursuant to 35 U.S.C. § 285.[15] UTC filed a timely Answer seeking (1) affirmance of the Board's Decision with respect to its denial of Rolls–Royce's preliminary motion for no interference-in-fact and (2) reversal of the Board's Decision with respect to its denial of UTC's preliminary motion to add new claim 24 to its '931 application.[16]

### II. Discussion

A § 146 action in district court is "essentially a proceeding to review the action of the Board." *Conservolite, Inc. v. Widmayer*, 21 F.3d 1098, 1102 (Fed.Cir.1994). The proceeding itself is a hybrid between an appeal and a trial *de novo*. *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 592 (Fed.Cir.1997). As trier of fact, the court may hear live testimony and receive documentary evidence, "but normally only as to issues raised by the parties during the proceedings below or by the Board's decision." *Conservolite*, 21 F.3d at 1102. Ultimately, the district court reviews the Board's findings of fact and law *de novo*. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1347 (Fed.Cir.2000).

The issues before the Court, reviewed *de novo*, are (1) whether the Board properly denied Rolls–Royce's motion for no interference-in-fact and (2) whether the Board properly dismissed UTC's motion to add a new claim to its application. At the heart of these issues is the Board's claim construction of several key disputed terms. None of these issues can be resolved without first understanding the parties' inven-

---

indistinct from one another under § 102 (novelty) and § 103 (obviousness).

**14.** In relevant part § 146 provides:
Any party to an interference dissatisfied with the decision of the Board of Patent Appeals and Interferences on the interference, may have remedy by civil action.... Such suit may be instituted' against the party in interest as shown by the records of the Patent and Trademark Office at the time of the decision complained of....
35 U.S.C. § 146.

**15.** Section 285 allows for the award of attorney fees in patent litigation to a prevailing party if the case is found to be "exceptional."

**16.** Section 146 provides in relevant part that "the record in the Patent and Trademark Office shall be admitted on motion of either party ... without prejudice to the right of the parties to take further testimony.... The testimony and exhibits of the record in the Patent and Trademark Office when admitted shall have the same effect as if originally taken and produced in the suit." The '195 interference record can be found as an attachment to Rolls–Royce's Memorandum of Points and Authorities in Support of Plaintiff's Motion to Admit Interference Record (Docket # 142).

tions as described in Rolls–Royce's '077 patent and UTC's reissue application '931.

## A. *The Inventions at Issue*

### 1. *Background*

Rolls–Royce and UTC [17] represent two of the world's three [18] major commercial jet engine manufacturers. The invention at issue here is directed, towards the "fan stage" of these engines. The fan stage is the most forward part of the engine.

The primary function of the fan' stage of a jet engine [19] is to provide propulsive thrust. '077 pat., col. 1, 11. 11–13. The stage itself generally consists of a cascade of "fan blades," which are attached to, and extend radially outward from, a central, rotatable hub. '985 pat., col. 1, 11. 11–31. The fan stage, along with the rest of the engine's stages, is enclosed by a generally cylindrical-shaped cover known as a "casing." '985 pat., col. 1, 11. 19–20,

During engine operation, the fan blades and hub, driven by a shaft, rotate about the engine's longitudinally extending rotational axis. *Id.* at col. 1, 11. 13–15. In this state, the rotating fan blades provide thrust for the jet engine in a manner analogous to propeller blades on a convention-al, piston-driven airplane engine. UTC's Trial Brief at 2.

### a. *Passage Shock*

A phenomenon generically called "shock" has long, been known to occur in the fan stage of an operating jet engine. Shock is generally caused by the supersonic flow of a compressible medium such as air over a body. In the context of the fan stage, shock tends to occur in the radially outer region (or tips) of the blades rather than in the radially inner region (near the hub). This shock phenomenon occurs due to the mechanics of a rotating body, in that the relative velocity of the air flow over the blades increases with increasing radius.[20] Therefore, the. relative speed of air passing over the rotating blades, under certain operating conditions, is subsonic in the inner and medium regions of the blades, but supersonic in the outer regions near the tip.

A particular type of shock which occurs under certain operating conditions [21] is known as "passage shock." The shock occurs because pressure built up behind the fan causes air flowing through the engine to slow down. As the air slows from supersonic speed in front of the blades, to subsonic speed behind the

**17.** UTC manufactures jet engines through its better-known, wholly-owned company Pratt & Whitney. However, for the sake of consistency, the defendant will be referred to as' "UTC" rather than "Pratt" or "Pratt & Whitney," even though defense counsel have occasionally referred to the defendant at trial and in the pleadings as "Pratt" or "Pratt & Whitney".

**18.** The *third major manufacturer is General Electric Co.*

**19.** The term "jet engine" is actually slang. Such engines are more accurately called "gas turbine engines." Docket # 142, Exh. 1007. Moreover, there are several different types of gas turbine engines, including "turbojets,"

"dual compressor engines," "turbofans," "turboprops," and "turboshaft engines." *Id.* at 1–3. However, because these technical distinctions are not relevant to the issues here, the Court will simply, refer generically to "jet engines" in this opinion.

**20.** Rolls–Royce's Trial Brief at 3. (schematic diagram explaining mechanics of rotating blade arid why the tips of rotating blade travel a farther distance than inner region of the blade).

**21.** Typically, the phenomenon occurs during high speed engine operating conditions, because the blades are rotating faster causing the relative air speed over the tips of the blades to *reach supersonic* speeds.

blades, a shock occurs. The shock is called "passage shock" because it occurs in the air passage between adjacent blades of the fan. It also occurs only in the outer regions of the blades for the reasons already discussed above.

Passage shock has long been known in the industry to cause problems in the operation of jet engines. Most significantly, it contributes to the overall noise of the engine and causes inefficiencies in its operation. Reducing noise level is important to airlines because many airports have strict noise restrictions during certain times of the day. Improving the efficiency of engines is likewise important to the airlines for saving on fuel costs.

### b. Radial and Swept Fan Blades

One approach to eliminating or reducing passage shock and. its negative effects has been to alter the shape of fan blades. Traditionally, fan blades have been shaped in a *"radial"* or substantially straight manner. While functional, radial blades suffer the full force of passage shock due to the air striking the leading edge of these blades at a perpendicular angle. As a result, the supersonic relative air velocity over the tips of radial blades is maximized, causing maximum passage shock effect.

To alleviate the effects of passage shock, engineers began experimenting with highly angled or "swept blades" as early as the 1970's. *See* Bliss U.S. Pat. No. 3,989,406 ("Bliss"). Bliss, for example, taught that there are benefits to angling the blades into the incoming air ("forward sweep") or away from the incoming air ("rearward sweep"). Sweeping the leading edge of the blades has the effect of reducing the relative velocity of air over the leading

edge, which in turn, reduces or eliminates the effects of shock.

The inventions taught by UTC's '931 application and Rolls–Royce's '077 patent are both directed towards improvements to the traditional swept fan blades. Specifically, both inventions teach improvements to the efficiencies of prior art swept blades. However, there are also significant differences between the parties' inventions including (1) the objects of inventions and (2) the manner in which those objects are achieved.

### 2. UTC's '931 Application (Based on the '985 Patent)

The specification for UTC's '931 reissue application is based on (by incorporation) its issued '985 patent.[22] Therefore, consistent with the PTO record, and pleadings and arguments of the parties, the '985 patent is considered the specification for UTC's '931 reissue application. Additionally, as is customary in patent law, the '985 patent will be referred to hereinafter by the first of the named inventors, Spear.

### a. Object of the Invention

The only object of Spear's invention expressly stated in the specification is to maximize engine efficiency. Spear col. 2, 11. 11–13. Efficiency is maximized, Spear teaches, by "limiting the number of shocks" experienced by each blade during operation. Spear col. 1, 11. 57–58. There are actually two types of shocks described by Spear, the adverse affects of which the invention seeks to minimize. The first shock is the traditionally known passage shock described above. The second shock described by Spear is known as *"endwall shock."*

---

**22.** The '985 patent is the patent UTC seeks to reissue through its '931 application at issue in     this interference.

### b. Endwall Shock

Endwall shock, which Spear explains is "unrelated" to passage shock, is actually caused by the sweeping of fan blades. The shock occurs during engine operation, when pressure waves form along the span of the suction surface [23] of each blade. As the blades rotate, these, "incident waves" (60) bounce off the inner wall of the engine casing as "reflected waves" (62). Where the incident and reflected waves meet, they coalesce to form endwall shock (64). The endwall shock occurs in the vicinity of the casing, extending radially inward from the tip of the blade only a limited distance.

Spear teaches that in traditionally swept fan blades, passage shock and endwall shock occur in two different locations with respect to the leading edge of the blade. Passage shock, as taught by Spear, is "attached to" the blade's leading edge, while endwall shock occurs in front of the leading edge. Because of these staggered locations, "the [air] flowing [through the blades] encounters multiple shocks and experiences unrecoverable losses in velocity and total pressure, both of which degrade the engine's efficiency." Spear col. 1, 11. 45–48.

Spear's invention is a swept fan blade whose unique shape causes the passage shock to be "brought into coincidence with the endwall shock[,] so that the [air] does not encounter multiple shocks." Spear col. 4, 11. 58–62. This coincidence of the shocks improves efficiency, because "the aerodynamic penalty of. coincident shocks is. less than that of. multiple individual shocks." Spear col. 4, 11. 65–67.

### c. Reduced Sweep at the Tip of the Blade

Spear's invention to achieve coincidence of shock can best be described as a swept blade having reduced sweep at the tip. Although the specification teaches two general embodiments of the invention, we will discuss only the one relevant to the interference—the "swept back" embodiment of fig. 2. This swept back embodiment is described as "[t]he leading edge [28] is swept back at radii greater than the inner transition radius ["$r_{t\text{-}inner}$"].[24]" Spear col. 5, lines 57–58.

In the swept back embodiment of fig. 2, Spear teaches a fan blade whose radial length can be divided into three distinct regions based on the sweep angle of the blade. The first or "inner region" of the blade begins at the blade's hub and ends at the inner transition radius, $r_{t\text{-}inner}$. *See* Spear col. 5, line 55–col. 6, line 8 and fig. 2. The inner region is defined by "forward sweep," meaning the blade's leading edge (28) is angled forward, or upstream into the direction of airflow. *Id.*

The second or "intermediate region" begins at the inner transition radius, $r_{t\text{-}inner}$, and ends at the outer transition radius, $r_{t\text{-}outer}$. *Id.* The intermediate region is defined by a "first sweep angle," $o_1$, which is "swept back" at a rate that is "nondecreasing" with increasing radius. Spear col. 5, lines 33–35. In other words, the leading edge (28) is angled backwards, or downstream with the direction of airflow (swept back), at an angle that either increases or at least remains constant (nondecreasing) with increasing radius. *Id.*

---

**23.** Every fan blade has both a "pressure surface" and a "suction, surface." The pressure surface is the surface of the blade that scoops air as the blade rotates. The suction surface is simply the surface opposite the pressure surface.

**24.** Compare with Spear's "swept forward" embodiment of fig. 6, where the leading edge (28) is swept forward at radii greater than the inner transition radius ($r_{t\text{-}inner}$). Spear col. 5, lines 22–45.

The third and most critical region of Spear's blade is the "outer region," otherwise known as the "tip region" (74). This region is "radially bounded by the outer transition radius $r_{t\text{-outer}}$ and the tip radius $r_{t\text{-tip}}$." Spear col. 5, lines 38–33. More importantly, it is defined by a "second sweep angle[, $o_2$, that] is nonincreasing (decreases, or at least does not increase) with increasing radius." Spear col. 5, lines 39–42. In other words, the second sweep angle $o_2$ remains constant or decreases with increasing radius.

The innovation of the nonincreasing sweep angle in the tip region is best understood by comparison to the prior art. In figure 2, one can see the difference between Spear's blade 22 (indicated by solid lines) and a conventional prior art swept blade 22' (indicated by dashed lines). In the tip region (74), the conventional blade increases its rearward sweep while Spear's blade reduces it. Turning to figure 3, the end result is that the tips of Spear's blades 22 (indicated by solid lines) are positioned relatively forward compared to the prior art blades 22' (indicated by dashed lines). The result is that the passage shock (66), which remains attached to the blade's leading edge, is brought into coincidence with the more forward positioned endwall shock (64).

### 3. Rolls–Royce's '077 Patent

As with UTC's '985 patent, the Court will refer to Roll–Royce's '077 patent by the name of its inventor, Rowlands.

#### a. Object of the Invention

Rowlands teaches a number of objects of his "Swept Pan Blade" invention. In addition to improving engine efficiency, as taught by Spear, the objects of Rowlands invention include (1) improved stability, Rowlands col. 4, lines 7–17; (2) reduced mechanical loads and stresses on the blades, *Id.* at lines 22–42; and (3) improved tolerance to foreign object damage caused by bird strikes', *Id.* at lines 43–47. Because many aspects of Rowlands invention are beyond the scope of the interference dispute, the Court will only address those improvements and means that are relevant to the interference proceedings.

An important difference between the Spear and the Rowlands' inventions is the importance of stability in the Rowlands invention. Specifically, Rowlands teaches that although swept fan blades "generally exhibit good efficiency levels," this benefit normally comes "at the expense of stability. . . ." Rowlands col. 3, lines 42–43. One of the objects of Rowlands' invention, however, is to "increase fan rotor efficiency . . . with no erosion of . . . stability. . . ." *Id.* The means for achieving this objective end includes a fan blade that has forward sweep at the tip. Rowlands col. 5, lines 31–33.

#### b. Forward Sweep at the Tip

Like Spear, Rowlands teaches an alteration to the traditionally shaped swept fan blade to improve its performance. Additionally, Rowlands, like Spear, teaches a fan blade that is forward swept in an inner region and rearward swept in an intermediate region. But in the outer region, where Spear teaches a reduced sweep.("nonincreasing"), Rowlands teaches a blade with forward sweep. Moreover, Rowlands teaches an entirely different motive for altering the blade's sweep in the outer region.

An important motive for Rowlands' invention is to "overcome [ ] . . . inherent stability problems of [traditionally swept blades]." Rowlands col. 4, lines 18–19. One such stability problem is a phenomenon known as "surge." At its worst, surge can cause a dangerous stall condition whereby the jet engine fails to provide thrust because of a "violent reversal of airflow." Rowlands col. 4, lines 15–16. A

known cause of surge is the position of passage shock in front of the leading edge of the outer region of the fan blades. *Id.* at lines 11–13. In this state, the passage shock is said to be "spilled" or "expelled." *See* Rowlands fig. 3b. (depicting an expelled passage shock in a traditionally shaped rearward swept fan blade).

Rowlands teaches that one way to capture or intercept the passage shock with a swept fan blade is to sweep the tip of the blade forward. This alteration causes the shock surface to move "rearwards, away from the leading edge, at the blade tip." Rowlands col. 4, lines 15–16 and figs. 2b. and 4b. (for examples of captured passage shock). The improved Rowlands swept fan blade, therefore, has a blade profile that is forward swept in the inner region, rearward swept in the intermediate region, and forward swept in the outer region. In short, the blade has forward-rearward-forward sweep.

### c. Convergent Casing

Another feature of the fan stage taught by Rowlands is a convergent casing over the tips of the blades. The traditional casing, which covers the internal parts of the jet engine, is shaped more or less like a cylinder, maintaining a substantially constant diameter in the axial direction. A convergent casing, however, "is tapered in the downstream direction" over the tips of the blades. Rowlands col. 6, lines 15–16 and fig. 5a. Rowlands teaches that the motivation for using a convergent casing is "to avoid complicated aerodynamic interference effects which might otherwise be brought about by reflection of the passage shock waves from the casing wall as has been described in U.S. Pat. No. 5,642,985." Rowlands col. 6, lines 22–26.

### B. Claim Construction

Despite the length and complexity of the record for this litigation, at the core of this dispute is how certain key terms in the patents claims are interpreted.

### 1. Applicable Law

■ The first step in an interference-in-fact analysis is to construe the claims. *Medichem, S.A. v. Rolabo, S.L.,* 353 F.3d 928, 932–33 (Fed.Cir.2003). Claim construction is a question of law "exclusively within the province of the court." *Markman v. Westview Instruments,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Sitting *de novo,* this Court need not give any deference to the claim constructions rendered by the Board. *Winner,* 202 F.3d at 1347.

■ A court should construe a claim term based upon "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir. 2005). "In some cases, ... claim construction ... involves little more than the application of the widely accepted meaning of the commonly understood words." *Id.* at 1314. In other cases, where "the meaning of a claim term as understood by persons of skill in the art is ... not immediately apparent, [then] ... the court looks to ... the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence...." *Id.*

"It is ... entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. However, a court must "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. "[T]he line between construing terms arid importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains

on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.*

### 2. *One of Ordinary Skill in the Art of Fan Blade Design in 1995–1996*

A person of ordinary skill in the art is a theoretical person, whose credentials and abilities are relevant to the issues of claim construction and § 103 obviousness. The relevant time frame for one of ordinary skill in the art is the time of the invention. *Phillips,* 415 F.3d at 1313. The "time of invention" is the effective filing dates of the application and patents at issue, that is, November 17, 1995 (UTC) and April 9, 1996 (Rolls–Royce). Thus, the Court must determine the credentials and abilities of one of ordinary skill in the art of fan blade design in the 1995–95 time-frame.[25]

According to the testimony of Rolls–Royce's expert witness W. John Calvert, a person of ordinary skill in the relevant art in 1995–96 would "have at least a bachelor's degree in ... general engineering, [plus] ... four to five years at least of experience dealing with the transonic and supersonic flows occurring in a gas turbine engine." Trial Tr. at 270–71. However, the person's experience, with swept fan blades in particular, Calvert testified, would have been "[p]robably very limited, because at that time, work on swept fan blades wasn't widespread, so they would probably have very little direct experience of that." *Id.* at 271.

UTC's expert witness, Dr. Yuan Dong, described a person of ordinary skill in the art as "someone with an advanced degree in fluid mechanics and/or with numerous years of experience designing fans for ducted gas turbine engines for airplanes." Trial Tr. at 527. Given the complexity of the field, the Court agrees with UTC's position. That is, one of ordinary skill in

the art would have several years of experience designing fan blades and/or hold an advanced engineering degree in fluid mechanics.

### 3. *Claim Terms at Issue*

The claims at issue here are UTC's '931 claim 23, Rolls–Royce's '077 claim 8, and UTC's proposed '931 claim 24. For ease of reference, these claims are set out in the following chart, with differences in claim language noted in bold.

| UTC's '931 Application Claim 23 | Rolls–Royce's '077 Patent Claim 8 |
|---|---|
| A fan stage of a ducted fan gas turbine engine that is rotatable about an axis of rotation and defines a downstream direction along the axis of rotation, comprising: | A fan stage of a ducted fan gas turbine engine that is **at least in part** rotatable about an axis of rotation and defines a downstream direction along the axis of rotation, comprising: |
| a fan casing that defines an inner duct wall having a fan rotor region; | a fan casing that defines an inner duct wall having a fan rotor region; |
| a hub disposed concentrically relative to the fan casing; | a hub disposed concentrically relative to the fan casing; |
| a fan rotor that includes multiple swept fan blades, the swept fan blades being spaced apart around the hub **and being capable of rotating at speeds providing supersonic working medium gas velocities over the blades to cause a shock in the gas adjacent the inner duct wall,** each of the multiple swept fan blades having: | a fan rotor that includes multiple swept fan blades, the swept fan blades being spaced apart around the hub, each of the multiple swept fan blades having: |
| a tip profile that **corresponds** to the inner duct wall of the fan casing; | a tip profile that **is convergent so as to substantially correspond** to the **convergent** inner duct wall of the fan casing; |
| a leading edge that defines a variable sweep angle in a direction perpendicular to the axis of rotation, the leading edge including: | a leading edge that defines a variable sweep angle in a direction perpendicular to the axis of rotation, the leading edge including: |
| an inner region adjacent the hub, the inner region defining a forward sweep angle; | an inner region adjacent the hub, the inner region defining a forward sweep angle; |

25. The Board did not define "one of ordinary skill in the art" in its Decision.

an intermediate region between the inner region and the fan casing, the intermediate region defining a rearward sweep angle; and

an outer region between the intermediate region and. the fan casing, the outer region being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region to provide a sweep angle that causes the blade to intercept the shock.

an intermediate region between the inner region and the fan casing, the intermediate region defining a rearward sweep angle; and

an outer region between the intermediate region and the fan casing, the outer region defining a forward sweep angle.

---

UTC's Proposed Claim 24 for the '931 Application (Differences From UTC's Already Existing Claim 23 are in Bold)

---

A fan stage of a ducted fan gas turbine engine that is rotatable about an axis of rotation and defines a downstream direction along the axis of rotation, comprising:

    a fan casing that defines an inner duct wall having a fan rotor region, **the inner duct wall of the fan casing at the fan rotor region being convergent;**

    a hub disposed concentrically relative to the fan casing;

    a fan rotor that includes multiple swept fan blades, the swept fan blades being spaced apart around the hub and being capable of rotating at speeds providing supersonic working medium gas velocities over the blades to cause a shock in the gas adjacent the inner duct wall, each of the multiple swept fan blades having:

    a tip profile that corresponds to the inner duct wall of the fan casing;

    a leading edge that defines a variable sweep angle in a direction perpendicular to the axis of rotation, the leading edge including:

    an inner region adjacent the hub, the inner region defining a forward sweep angle;

    an intermediate region between the inner region and the fan casing, the intermediate region defining a rearward sweep angle; and

    an outer region between the intermediate region and the fan casing, the outer region being, translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region to provide a sweep angle that causes the blade to intercept the shock.

---

The Court need not construe every term of the above claims, but rather "only those terms ... that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir.1999); *see also United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997)(stating that claim construction "is not an obligatory exercise in redundancy"). The Court, therefore, in exercising its discretion, will construe only the following disputed terms as necessary to resolve the relevant issues in this interference.

> *a.*   *UTC's Claim 23—"translated forward"*

██ The meaning of UTC's claim term "translated forward" is vigorously contested by the parties. The Federal Circuit in *Phillips* explained that "apart from the written description, ... the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Additionally, "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those' terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed.Cir.2003). Given this guidance, the Court will construe "translated forward," as discussed below, in its context within claim 23.

> *b.*   *Claim 23—"the outer region being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region"* (emphasis added)

UTC argues, and the Board agreed, that "translated forward means that the leading edge of the fan blade is moved forward, towards the airflow direction." Decision at 11. The construction is best understood by reference to Spear's figure 3, which is a cross-sectional view of the tips of the blades of figure 2. Towards the bottom of this figure, there are three-directional arrows, labeled "U," "$V_x$," and "$V_r$," which represent all the possible directions that UTC's claim terra "forward" could mean. When the Board says "forward ... towards the airflow direction," it means towards the relative velocity vector, $V_r$. The relative velocity vector, $V_r$, is the relative velocity at which the "working medium" (air) strikes the leading edge of the fan blades during operation. $V_r$, itself, is sim-

ply a combination of the other two vectors, $V_x$ and U. $V_x$ is the axial velocity, or the velocity in which air flows axially through the engine during its operation. This "axial direction" is the direction Rolls–Royce argues that "forward" means. Finally, the "linear velocity U" represents the velocity of air striking the blade caused by its linear movement in the "circumferential" (or "tangential") direction, shown by the arrow "R" in fig. 3.[26]

After construing the term "translated forward," the Board interpreted the remainder of the claim as a whole. Specifically, it found that, taken together, the claim term

> the outer region being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region

is "broad enough to cover fan blades with an outer region that has a rearward sweep angle or a forward sweep angle." Decision at 12. Essentially, the Board agreed with UTC that the above claim describes a range of sweep angles in the outer region of a blade, that range including both reduced rearward sweep and forward sweep. The Court finds, however, that this claim construction is in error, and makes use of impermissible hindsight.

The Board first erred by finding the claim terms at issue to be unambiguous oh their face.[27] Based on the evidence of record, the Court finds that one of ordi-

nary skill in the art would not have understood the relevant claim terms without resorting to the specification. The prior art teaches that blade designers have used a number of industry terms and parameters to describe the shape of their blades. By way of example, these terms and parameters include angles,[28] "sweep,[29]" camber,[30] and "chord[31]". The term "translation," however, does not appear in any prior art of record, except in the Spear specification. Moreover, UTC has offered no evidence of any industry use of the term "translation" in the relevant context other than in the Spear specification. Finally, the Court finds that the surrounding words of the claim would have only added to the confusion of one of ordinary skill in the art rather than clarifying the meaning of "translated forward." A person of ordinary skill in the art would not understand a description of a fan blade's outer region

> being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region

without resorting to a diagram or some further explanation.[32] For the sake of comparison, one of ordinary skill in the art would have been able to understand Rolls–Royce's parallel claim. language simply as "defining a forward sweep angle."

Because UTC's claim language is ambiguous on its face, a person of ordinary skill in the art would be forced to read the

---

**26.** Neither party argues that "forward" means in the circumferential direction.

**27.** Decision at 11. (stating that "[t]here is no apparent ambiguity in the meaning of an outer region of the leading edge of a fan blade being translated forward ...")

**28.** *E.g.* U.S. Pat. No. 3,989,406 ("Bliss"); U.S. Pat. No. 4,012,172 ("Schwaar"); U.S. Pat. No. 4,726, 737 ("Weingold").

**29.** *Id.*

**30.** Weingold at col. 2, line 42.

**31.** Chord is the measure of a blade's width. *See* Weingold, fig. 3; Schwaar at. col. 6, line 11.

**32.** It is worth noting that the above diagram was only created by UTC as a demonstrative for purposes of this litigation, and therefore did not exist in the specification or anywhere else in the prior art.

specification for guidance and meaning. The person of ordinary skill in the art would then discover that the term "translated" appears only once in the specification, and within a very discrete context. The context is the embodiment of Spear's invention depicted in figures 2 and 3. Spear col. 4, line 63—col. 5, line 21. There, Spear teaches a fan blade whose "leading edge, in comparison to the leading edge of a conventional blade, has been *translated axially forward parallel to the rotational axis* . . . ." Spear col. 4, lines 66. (Emphasis added). Referring to figure 3, Spear depicts the meaning of the "translated axially forward" direction. There, the blade tips of this embodiment (depicted in solid) are moved forward, relative to the prior art blade (depicted in phantom), in a direction that is parallel to the rotational axis (18) and towards the working medium arrow (48).

In conclusion, given the ambiguity of the claim terms standing alone, and. reading them "in view of the specification, of which they are part," the Court construes this claim to mean that one of ordinary skill in the art would have understood Spear's Claim 23, that is,

> "the outer region being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region"

to mean that "the outer region is moved axially forward in the direction of the working medium."

### c.  Claim 23—"the shock"

■ As with the last disputed claim term, "the shock" can only be construed properly based on its context within claim 23. The relevant antecedent language, for "the shock" is

> the swept fan blades being capable of rotating at speeds providing supersonic working medium gag velocities over the

blades to cause *a shock* in the gas adjacent the inner duct wall

(Emphasis added). The relevant contextual language is discussed below.

### d.  Claim 23—"to provide a sweep angle that causes the blade to intercept the shock." (emphasis added)

The Board did not construe this section of claim 23 at all. Instead, it construed only UTC's claim 18, which omits this last limitation, even though the parties stipulated to the Board what they have stipulated to this Court, that UTC's claim 23 and Rolls–Royce's claim 8 are fully representative of the '195 interference. The Court has accepted this stipulation in analyzing the terms in UTC's claim 23 and Rolls–Royce's claim 8.

UTC argues for a generic construction of the term "the shock" as "the pressure wave produced by supersonic motion of a body in a medium that is forward of the leading edge of the blade, near the inner duct wall." UTC's Opposition Brief to Rolls–Royce's Trial Brief at 27. UTC further argues that any more specific construction would impermissibly read limitations of the specification into the claim. Alternatively, it argues that

> even if the Court construes the term "shock" in claim 23 to mean "endwall shock," this does hot limit claim 23 to a rearward sweep angle. Regardless of whether the "shock" forward of the leading edge is called "shock," "endwall shock," or "spilled passage shock," a fan blade designer would translate the blade forward to intercept it, which might result in forward sweep angles in the outer region in at least some blades, with at least some operating conditions.

*Id.* at 30.

The Court disagrees with this construction for the same reasons it disagreed with

UTC's proposed construction of "translated forward." That is, one of ordinary skill in the art would find the term "the shock" ambiguous as used in this claim in light of the entire Spear specification. The ambiguity arises from the specification teaching that there are actually two distinct types of shock; a passage shock and an "unrelated [33]" endwall shock. As described in the claim, both of these types of shock occur "in the gas adjacent the inner duct wall" and are caused by "supersonic working medium gas velocities over the blades." Of the two shocks, the specification repeatedly and consistently states that only the endwall shock is "intercepted," as described in the claim limitation, by the unique sweep angles of the invention. The other shock, passage shock, remains attached to the blade's leading edge, or in other words, is already intercepted by the prior art swept blades. Therefore, the Court construes the term "the shock" as meaning "endwall shock," consistent with how one of ordinary skill in the art would have understood it in view of the specification.

The Court next turns to the construction of the entire phrase: "a sweep angle that causes the blade to intercept the shock." Again, UTC's claim language is ambiguous on its face; this time, because of its functional nature. One of ordinary skill in the art, reading the claim alone, would not understand exactly what sweep angle is required to "cause the blade to intercept the shock." By comparison, Rolls–Royce's parallel claim language is structural in nature, describes the outer region simply as "defining a forward sweep angle," and would therefore be understood on its face by one of ordinary skill in the art.

Because of the ambiguity in UTC's claim, one of ordinary skill in the art would have to resort to the specification. In doing so, the person would be looking for guidance as to exactly what sweep angle in the outer region of the blade would cause it to intercept the endwall shock (as the Court has construed "the shock"). In the UTC application the entire specification is devoted to teaching this critical sweep angle, which Spear labels as the "radially varying second sweep angle $o_2$." Spear col. 4, lines 25–26. This sweep angle is very precisely and consistently described by Spear throughout the specification, as being "nonincreasing (decreases, or at least does not increase) [34] with increasing radius." Spear col. 4, lines 27–29 and fig. 2: Spear goes on to explain that

the nonincreasing character of the second sweep angle ... causes a portion of the airfoil leading edge to be far enough forward (upstream) in the working medium ... that the section of the airfoil ... *intercepts the endwall shock 64.*

Spear col. 4, lines 47–53. (Emphasis added).

Given the teachings of the specification, the Court finds that one of ordinary skill in the art would have understood the claim

---

33. Spear col. 1., lines 42–43

34. The parties agree that "nonincreasing" means the angle stays constant or "decreases." They disagree, however, oh the meaning of "decreases." Referring to Spear fig. 2, UTC argues that "decreases" includes the scenario where $o_2$ reduces to zero degrees then goes forward. Forward swept angles, by convention, would be defined as negative angles. Therefore, because a negative value angle (forward sweep) is numerically less than a positive value angle (rearward sweep), a forward sweep angle is contemplated by "decreases." Rolls–Royce argues, however, and the Court agrees, that if $o_2$ goes to forward sweep, this would constitute a total reversal of direction rather than a mere "decrease" of the angle, and is therefore not contemplated by any reasonable definition of "nonincreasing".

language "to provide a sweep angle that causes the blade to intercept the shock" to mean "a sweep angle in the outer region that is constant or decreasing." This construction would not include forward sweep. Accordingly, the Court accepts the Board's finding that UTC's claims inherently include a range of angles and that the range of angles begins with a rearward sweep angle at the outward boundary of the intermediate region.[35] Unlike the Board, however, the Court finds that the possible range of angles ends at a zero degree sweep, as disclosed in Spear, and does not include any forward sweep.

In support of enablement for forward sweep., the Board cited to the following written description in Spear:

> The embodiment of FIGS. 2 and 3 illustrates a blade whose leading edge, in comparison to the leading edge of a conventional blade, has been translated axially forward parallel to the rotational axis (the corresponding translation of the trailing edge is an illustrative convenience—the location of the trailing edge is not embraced by the invention). However *the invention contemplates any blade whose airfoil intercepts the endwall shock to bring passage shock into coincidence with the endwall shock.*

Spear col. 4, line 63–col. 5, line 4. (Emphasis added). The Board then speculates that:

> Perhaps one skilled in the art would understand the above passage with reference to "any blade whose airfoil intercepts the endwall shock to bring the passage shock into coincidence with the endwall shock" to suggest that the leading edge of the outer region of the blade may be translated forward to any degree, and not just to a point where the

outer region maintains a rearward sweep angle.

Decision at 12.

The Court rejects such speculative reasoning and gives little weight to the cited Spear written description, which is nothing more than a boilerplate disclaimer. More importantly, this description would not be enabling of, or shed light on, any claim terms because this language simply cites a goal (i.e., bringing passage shock into coincidence with endwall shock) without any explanation of a structure to achieve that goal.

e. *Claim 23*—"the outer region being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region to provide a sweep angle that causes the blade to intercept the shock."

For the sake of clarity, and consistent with the above constructions, the Court construes the above language of UTC's claim 23 to mean:

> an outer region, which is moved axially forward, and has a rearward sweep angle that is either constant or decreasing to a minimum of zero degree sweep.

Having construed the relevant disputed claim terms, the Court now turns to the first of two substantive underlying issues.

C. *There Is No Interference–In–Fact Between Rolls–Royce's '077 Patent and UTC's '931 Reissue Application*

The Court finds, for the reasons discussed in more detail below, that there is no interference-in-fact between Rolls–Royce's '077 patent and UTC's '931 reis-

---

**35.** Both parties agree that the sweep angle at the "outward boundary of the intermediate region" is a rearward sweep angle.

sue application. Therefore, the Board erred in denying Roll–Royce's preliminary motion for judgment based on no interference-in-fact under 37 C.F.R. § 1.633(b).

### 1. Law of Interference–in–Fact

The PTO's interference rule 37 C.F.R. § 1.601(j) defines an "interference-in-fact" as follows:

> An interference-in-fact exists when at least one claim of a party that is designated to correspond to a count and at least one claim of an opponent that is designated to correspond to the count define *the same patentable invention.*

(Emphasis added). The phrase, "the same patentable invention" is described by an example:

> invention A is the "same patentable invention" as invention "B" when invention "A" is the same as (35 U.S.C. § 102) or is obvious (35 U.S.C. § 103) in view of invention "B" assuming invention "B" is prior art with respect to invention "A."

*Conservolite,* 21 F.3d at 1101 (citing 37 C.F.R. § 1.601(n)).

Using that example in this case, one can think of Rolls–Royce's invention as "A" and UTC's as "B." Moreover, the parties have stipulated that whether Rolls–Royce's claimed invention is "the same patentable invention" as UTC's is limited to a question of obviousness under 35 U.S.C. § 103. Lastly, because this is an interference proceeding, the Court must compare only the parties' claims in its interference analysis, without resort to the patents' specifications.[36] As discussed above, the parties have stipulated that Rolls–Royce's claim 8 and UTC's claim 23 are fully representative of the one count in this interference. Therefore, the parties agree that whether or not there is an interference-in-fact depends entirely on whether Rolls–Royce's '077 patent claim 8 would have been obvious under 35 U.S.C. § 103 in view of UTC's reissue application claim 23.

### 2. Burdens of Proof

■ Before declaring an interference, the Board "must determine that the subject matter of the application claim,[37] whether or not the language of the claim is identical to that of the patent claim,[38] is patentable, and whether the claims are drawn to the same invention." *Conservolite,* 21 F.3d at 1101 (citing 37 C.F.R. §§ 1.601, 1.606). Once declared, however, the interference is presumed to. be valid, and the condition that the adverse parties have claimed the "same patentable invention" is prima facie established. *Id.* A party, such as Rolls–Royce, who challenges the existence of an interference-in-fact, by way of preliminary motion under § 1.633(b), bears "the burden ... to persuade the examiner-in-chief or the Board of the merits of his or her position." [39] If the motion is denied by the Board, and the moving party seeks review of the decision in district court, then that party, as the "dissatisfied party" under § 146, bears the

---

**36.** *Noelle v. Lederman,* 355 F.3d 1343, 1352 (Fed.Cir.2004) (stating that "[a] patentee's invention is only found in a patentee's claims, unless the patentee uses sufficient means-plus-function language to invoke 35 U.S.C. § 112, paragraph (6). Thus, if the Board is to compare two inventions [in an interference-in-fact analysis], the Board must only compare the parties' claims.").

**37.** Here, UTC's '931 reissue application claim 23, by stipulation of the parties.

**38.** Here, Rolls–Royce's '077 patent claim 8, by stipulation of the parties.

**39.** *Id.; See also* 37 C.F.R. § 41.208. (stating that "the burden of proof is on the movant" to "provide a showing, supported with appropriate evidence, such that, if unrebutted, it would justify the relief sought.")

burden of proving that the motion was wrongly denied.[40] For these reasons, Rolls–Royce bears the burden of proving that there is no interference-in-fact.

### 3. Law of § 103 Obviousness

The test for whether an invention is deemed "obvious" under 35 U.S.C. § 103 is articulated in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), which held that this mixed question of law and fact should be decided based on both "primary" and "secondary" considerations. First, the Court must determine such primary considerations as: "the scope and content of the prior art ...; differences between the prior art and the claims at issue ...: and the level of ordinary skill in the pertinent art.... Against this background, the obviousness or nonobviousnes of the subject matter is determined." *Id.* at 17, 86 S.Ct. 684. The "secondary considerations" under *Graham* include various categories of objective evidence which can support a finding of nonobviousness. They include commercial success, long felt but unresolved needs, failure of others, copying, unexpected results, and industry acclaim.[41]

### a. Limitations on the use of Prior Art in the Context of an Interference

■ As to the primary considerations of obviousness,

> the proper focus ... is on whether the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the

time the invention was made to a person having ordinary skill in the art....

*Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 808 (Fed.Cir.1989) (internal quotations omitted). In this analysis, "the person of ordinary skill is charged with knowledge of the entire body of technological literature, including that which might lead away from the claimed invention." *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed.Cir.1988). "When an obviousness determination is based on multiple prior art references, there must be a showing of some 'teaching, suggestion, or reason' to combine the references." *Winner*, 202 F.3d at 1348.

Although prior art references are used to find obviousness, in *Noelle v. Lederman*, 355 F.3d 1343, 1352 (Fed.Cir.2004), the Federal Circuit found that it was improper to rely on a party's specification to prove obviousness. *Id.* Instead, one "must only compare the parties' claims." *Id.* However, if certain terms of the claims are "ambiguous," it is appropriate to "resort to the specification or other sources to define those terms." *Id.*

### 4. Rolls–Royce's Claim 8 is Nonobvious in View of UTC's Claim 23

Rolls–Royce argues that there are two material differences between its claim 8 and UTC's claim 23: 1) Rolls–Royce's claim of an "outer region [of the leading edge of the-swept fan blade] ... defining a forward sweep angle," and 2) a "convergent inner duct wall of the fan casing."[42] Of these two, the Court finds Rolls–Royce's forward sweep at the tip feature to be nonobvious because UTC's claim 23

**40.** 3 John G. Mills III, Donald C. Reiley III, and Robert C. Highley, *Patent Law Fundamentals* § 16:16 (Thomson/West Rel. No. 12, 2004).

**41.** *Id.; see also Rosemount Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1544 (Fed.

Cir.1984); *Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed.Cir.1997).

**42.** For simplicity, these features will be referred to as "forward sweep at the tip" and "convergent casing," respectively.

does not capture this feature. As such, the inventions are patentably distinct under 37 C.F.R. § 1.601(j), and there exists no interference-in-fact.

### 5. Forward Sweep at the Tip is Nonobvious

#### a. Primary Considerations

■ Both the Decision and UTC's defense to Rolls–Royce's no interference-in-fact motion rely on the assertion that UTC's invention includes forward sweep at the tip. As discussed above, however, the Court finds that such forward sweep is not included in UTC's claim 23. Consistent with *Noelle,* the Court reached that conclusion using the parties' specifications only in the course of claim construction. In construing UTC's ambiguous claim language:

> the outer region being translated forward relative to a leading edge with the same sweep angle as an outward boundary of the intermediate region to provide a sweep angle that causes the blade to intercept the shock

the Court finds that UTC's "invention," for purposes of the interference, does not incorporate forward sweep at the tip because one of ordinary skill in the art would understand the sweep angle in the outer region to be nonincreasing (constant or reduced), up to zero degrees, but not sweeping forward. Therefore, the invention, as claimed, does not include forward sweep.

Beyond its claim 23, UTC (and the Board) offered no prior art references establish the obviousness of forward sweep at the tip of a swept blade. Moreover, consistent with *Noelle,* the Court cannot consider any of the teachings of UTC's specification to render obvious this feature. Therefore, because UTC does not claim this element, and no prior art teaches it,

the forward sweep at the tip element in Rolls–Royce's claim 8 is nonobvious.

#### b. Secondary Considerations

In *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed.Cir.1983), the Federal Circuit stated that:

> evidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. Indeed, evidence of secondary considerations may often be the most probative. and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

(internal citations omitted). The Court's conclusion of nonobviousness of Rolls–Royce's invention, although based solely on primary considerations, is confirmed by several secondary considerations. Specifically, long felt but unresolved need, industry acclaim, and commercial success support the Court's conclusion.

#### i. Long Felt But Unresolved Need

At trial, Rolls–Royce's Vice President of Marketing, Robert C. Nuttall, *("Nuttall")* provided compelling testimony about the commercial airline industry's need for ever quieter, more fuel efficient engines. Fuel efficiency, he testified, is important for cost savings, especially true for large, long-range aircraft. Trial Tr. at 215. By way of example, Nuttall discussed Airbus's new, 555 passenger A380 aircraft. *Id.*

> [T]his aircraft operating from the Far East to Europe, its typical mission is probably ten to 14 hours. *So,* it is spending the vast majority of its time at cruise conditions. And a Trent engine or indeed our competitor's engine will burn about 1,000 gallons of fuel an hour

while at cruise. *So,* over the life of the aircraft, say a 25–year life, the aircraft will consume about half a billion dollars worth of fuel. *So,* to [an airline], the opportunity for a very small percentage improvement in fuel burn can make a dramatic effect on their bottom line.

*Id.* at 215–16.

As for engine noise, he explained that because these aircraft operate from the Far East to Europe, they tend to take off at around midnight from the Far East. And they will land very, very early in the morning in Europe. And increasingly over the past say ten years, airports have increasingly brought in more stringent rules and regulations with regard to noisy aircraft. And even brought in curfews at some times. And in some extreme cases, that has meant that aircraft have to fly around waiting for a curfew to end before they can land. Which means that to an operator, the availability of a quieter aircraft is always a great benefit.

*Id.* at 216.

The evidence at trial showed that industry engineers began experimenting with highly swept fan blades in the 1970's, mostly to solve the problems of noise and inefficiency of existing jet engines.[43] By 1995–1996, when the inventions at issue were patented, much research had been conducted, many papers written, and a number of patents issued[44] on the subject of highly swept fan blades. Although the swept fan blade concept was highly promising, it remained a mere experimental concept, and had never been included in a feasible, commercially-sold engine.[45] The swept blades of the time were not feasible, the evidence showed, because of their "instability" in operation. Specifically, these early swept fan blades experienced a proclivity of passage shock surge in the outer region tending to cause a dangerous stall condition. The evidence clearly established that the airline industry, in its constant demand for ever quieter, more fuel efficient engines, had a long-felt but unresolved need for a feasible and commercially available, highly swept fan blade, and that long-felt need was met by the swept blade of Rolls–Royce's '077 patent claim 8. As Rowland's testimony established, beginning in late 1993,[46] he began researching the use of swept fan blades for the purpose of improving the blade's resistance to bird-strikes. Swept blades had advantages in this area because

> By leaning the blade, the bird would hit at a glancing angle, and the blade would slice it like a scimitar rather than a conventional blade, where it would hit like a broad sword.

*Id.* at 50. Rowlands started with a computer-simulated blade having forward sweep in the inner region and a 45 ° constant rearward sweep in the outer region.

The results of the project, which was known as "ALPS" (Advanced Low Pressure System Blades), are summarized in

---

**43.** *See, e.g.* U.S. pat. no. 3,989,406 ("Bliss patent").

**44.** *See e.g.* U.S. pat. no. 4,012,172 ("Schwaar patent"); U.S. pat. no. 4, 726, 737 ("Weingold patent").

**45.** *See e.g.* Joint Ex. 2025 (including June 2, 1997 presentation paper by GE engineers A.R. Wadia, P.N. Szucs and D.W. Crall describing swept fan blades as "experimental");

Trial Tr. at 52 (testimony of Rowlands explaining his findings, after a survey of the prior art literature at the time of the invention, "that there had been numerous attempts over the years to apply swept wing theory ... to fan rotor blades. There was no obvious successful application of this in the literature.").

**46.** Trial Tr. at 70.

an April 28, 1994, internal Rolls–Royce report. Plaintiff's Ex. 481. Based on computer aided simulations of the blade (no physical blade had been constructed), Rowlands concluded that:

An increase in tip chord may also be beneficial as this will increase the covered passage and will give a more swallowed shock.

It may be possible to use some form of tip treatment to improve stability. This is being investigated by the –535 IP rig program. If good results are achieved, tip treatment could be applied to the ALPS fan. The improved surge margin could be traded for increased efficiency.

*Id.* at 16. In other words, Rowlands postulated that an "increase in tip chord" (blade width)—which would have the effect of giving the tip of the blade a forward sweep angle—would improve a swept blade's stability (measured by surge margin).

The idea was implemented in Rowland's follow-up project called Swept Civil Research Fan ("SCRP"). The SCRF project involved experimentation with a swept fan blade having forward sweep in an inner region, rearward sweep in an intermediate region, and the critical change of forward sweep at the tip. The blade was also enclosed by a convergent casing. The SCRF blade and casing, in fact, was exactly the invention disclosed and claimed in Rolls–Royce's '077 patent, claim 8.[47]

The computer model analysis of the SCRF blade revealed dramatic results. As documented in Rowlands' August 18, 1995, internal Rolls–Royce report, Plaintiff Ex. 484, and as he explained at trial,

[t]he computer analysis predicted an efficiency improvement of 1.8 percent. . . . It's the fan that provides most of the thrust for the engine that drives the

aircraft, and the fan efficiency is a major—has a very strong effect on the fuel efficiency of the engines. In the industry, a half a percent of efficiency would be considered to be a huge gain, a very significant improvement, so 1.8 percent is, is phenomenal really. It's quite a remarkable result. It's three times that half percent.

Tr. at 63. The major breakthrough, however, was that this highly efficient swept fan blade, unlike the prior art, was also stable, due to the forward sweep at the tip. Rowlands explained:

We were fairly confident that we had at least as good stall margin as a conventional blade, and therefore, we had a workable design.

*Id.*

The blade described in claim 8, which to this point had only been modeled and tested on a computer, was later physically tested, and eventually incorporated into a Rolls–Royce engine called the Trent 8104. The parties do not dispute that the Trent 8104 was the very first commercially available engine incorporating fan blades with forward-rearward-forward sweep. On this record, the Court finds that Rolls–Royce satisfied a long-felt need in the industry, through the Trent 8104, for a feasible, highly swept fan blade engine having the important characteristics of high efficiency, low noise, and stability.

UTC makes much of the fact that the Trent 8104, which was designed for Boeing's long-range 777, was never sold, having lost out to a competing General Electric engine. The Court disagrees, however, with this narrow evaluation. The Trent 8104 became a model for the industry to follow, such that all three major manufacturers now produce large

47. Trial Tr. at 70.

civil aircraft engines incorporating fan blades with the forward-rearward-forward sweep design. In addition to solving a long-felt need, the Trent 8104, and the unique fan blades it incorporated, also received significant industry acclaim.

### ii. Industry Acclaim

The forward-rearward-forward swept fan blade of claim 8 received substantial industry acclaim, both internally at Rolls–Royce, and more importantly, from the industry as a whole. Internally, Rolls–Royce awarded Rowlands and his colleague Michael J. Adams [48] its 1999 Chairman's Award for innovation [49] for their work on the forward-rearward-forward swept fan blade, Externally, when the Trent 8104 engine was first publicly marketed beginning in 1999, it won the prestigious Flight International Award in Propulsion at the International Paris Air Show. The award was in recognition of the unique fan blade incorporated in the Trent 8104. Rolls–Royce's fan blade also received praise in established trade magazines including Flight International and Aviation Week & Space Technology. *See e.g.* Plaintiff's Exs. 330, 331, 352, 359, 362. Most notably, Rolls–Royce's Trent 8104 swept fan blades were featured oh the cover of the January/February 1999 edition of Flight International, with the caption "Trent Sweeps to Higher Thrust." Plaintiff Ex. 331. As Nuttall testified, "it is quite rare for engines to actually appear on the cover of this sort of magazine. It is usually aircraft." Trial Tr. at 225.

### iii. Commercial Success

Although Rolls–Royce never sold the 8104 engine, that engine was the first commercially available engine with highly swept fan blades. After public awareness of the Trent 8104, the rest of the industry quickly came out' with their own, similar versions of the highly swept fan blade engines. Today, the forward-rearward-forward sweep design is the industry standard for large civil aircraft engines.[50] On this record it is clear that the design. pioneered by Rolls–Royce has been commercially successful. Moreover, Rolls–Royce's individual market share for swept fan blade engines exceeds 50 percent. That is compelling evidence of its commercial success.[51]

UTC argues that Rolls–Royce has failed to establish the required nexus between engine sales and the invented fan blade design. The Court finds, however, through Nuttall's testimony and the trial exhibits, that the highly swept fan blades is a feature that was strongly marketed to the airlines. Moreover, the Court finds that the improved efficiency and noise characteristics of the fan blade have been a major driving force behind sales of Rolls–Royce engines that incorporate them.

### iv. Other Secondary Considerations are Unpersuasive

The Court found unpersuasive Rolls–Royce's evidence of other secondary con-

---

**48.** Adams helped to physically test the Rowlands' fan blade and incorporate it into the Trent 8104 engine.

**49.** This achievement award was given to Rowlands and Adams jointly, out of some 35,000 Rolls–Royce employees.

**50.** Nuttall testified that after the Trent 8104 engine was featured on the cover of Flight International magazine, "there is no aircraft

that was launched after this [year] that doesn't feature a swept fan. So, all of the aircraft, that would be the A380, the 787 and the A350, all of their engines feature swept fans." Trial Tr. at 226.

**51.** When an airline purchases a plane from a manufacturer such as Boeing or Airbus, they can often choose the particular make and model of the engine to power the plane.

siderations such as copying, failure of others; and unexpected results. For example, Rolls–Royce asserted that its forward tip design produced the unexpected results of improving both efficiency and stability, where in swept fan blades, the two performance parameters are typically inversely related. The Court agrees with UTC, however, that this is not an improvement of an unexpected "kind," as required for establishing unexpected results, but rather an overall improvement in the "degree" of performance. *In re Huang,* 100 F.3d 135, 139 (Fed.Cir.1996).

### 6. Convergent Casing Is § 103. Obvious but Moot

The Court agrees with that portion of the Board's decision · finding obvious Rolls–Royce's claim 8 convergent casing element. The prior art teaching convergent casings are legion.[52] Moreover, Rolls–Royce has admitted that at the time of the invention, 42 of its engines had convergent casings and corresponding blade tip profiles. UTC Trial Br. at 21. The feature was therefore well known and used to "to help reduce ... aerodynamic interference found on the blades...." Bliss col. 5, 11. 5–7. Therefore, it would have been obvious to one of ordinary skill in the art in 1995–96 to have added a convergent casing to the invention of UTC's claim 23.

The obviousness of Rolls–Royce's convergent casing element, however, is mooted by the nonobviousness of its forward sweep at the tip feature.

### D. UTC's Motion to Add Claim 24 is Denied as Moot

The Court agrees with the Board, although for different reasons, that UTC's preliminary motion to add claim 24 to its '931 application and to the interference count is moot. The proposed independent claim 24 would add the following new language to the already existing, independent claim 23

the inner duct wall of the. fan casing at the fan rotor region being convergent

By this motion, UTC is trying to capture through claim 24 the convergent casing feature of Rolls–Royce's claim 8. However, because the convergent casing is obvious, the Court finds that UTC's proposed claim 24 would add nothing new to the interference-in-fact analysis. Therefore, the Court will affirm that portion of the Decision dismissing as moot UTC's preliminary motion.[53]

Lastly, the Court declines to award attorneys' fees and costs finding that this is not an exceptional case under 35 U.S.C. § 285.

### III. Conclusion

For the reason's discussed above, the Board's February 2, 2005, Decision on Preliminary Motions will be affirmed to the extent it dismissed UTC's preliminary motion to add claim 24, however, the Decision will be reversed as to the denial of Rolls–Royce's preliminary motion. Because this Court finds that, there is no interference-in-fact between Rolls–Royce's '077 patent and UTC's '931 reissue application, judg-

52. *See e.g.* U.S. patent no's. 3,989,405 ("Bliss"), fig. 4; 4,012,172 ("Schwaar"), fig. 1; 4,726,737 ("Weingold"), fig. 1.

53. Given, the length of time between the bench trial and the completion of this Opinion, the Court invited the parties to supplement the record with any authority relevant to the issues in this litigation. In particular,

because obviousness was the core issue, the. parties were asked to address that issue in light of *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). These supplemental pleadings have been considered, but do not support any change in how this Court has evaluated the issues.

ment will be entered in favor of Rolls–Royce, by an Order that will issue with this Opinion.